**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| RBC BANK (USA), | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION 09-0038-WS-C** |
| | ) | |
| HOLIDAY ISLE, LLC, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on the motion of plaintiff RBC Bank (USA) ("RBC") to dismiss the counterclaim filed by certain defendants ("the Waddell Group"). (Doc. 80). The parties have filed briefs in support of their respective positions, (Docs. 80, 99, 110), and the motion is ripe for resolution. After carefully considering the foregoing and other relevant material in the file, the Court concludes that the motion to dismiss is due to be granted in part and denied in part.[1]

**BACKGROUND**

Members of the Waddell Group entered separate agreements with co-defendant Holiday Isle, LLC ("Holiday Isle") to purchase a number of units in a Dauphin Island condominium project with the eponymous name of Holiday Isle. Pursuant to their respective contracts with Holiday Isle, members of the Waddell Group presented letters of credit in the amount of 20% of the purchase price. When the Waddell Group declined to close, Holiday Isle declared them in default and called the letters of credit.

Members of the Waddell Group and others ("the Waddell plaintiffs") filed suit in the Northern District of Alabama ("the Waddell litigation") against Holiday Isle and

---

[1]The Waddell Group's motion for oral argument, (Doc. 121), is **denied**. *See* Local Rule 7.3.

others, including RBC.  The case was sent to arbitration except as to RBC, who was subsequently dismissed on the Waddell plaintiffs' motion.  The arbitrator decided in favor of most of the Waddell plaintiffs, including the members of the Waddell Group, ruling that they "are due to ... have all monies paid to [Holiday Isle], either by earnest money deposit or proceeds from a letter of credit, together with interest accrued thereon, returned to them."  (Doc. 80, Exhibit C at 10-11).  The basis of this award was that Holiday Isle had breached the contract by failing to complete the purchasers' units (which the arbitrator defined to include common areas) within the two-year period provided by contract.  (*Id*. at 4, 7-11). The Court confirmed this award and entered judgment thereon.

Holiday Isle maintains an account ("the Account") with RBC, into which Holiday Isle deposited proceeds of the called letters of credit, including those of the Waddell Group.  RBC filed this action pursuant to 28 U.S.C. § 1335 to determine the right to the funds (over $3 million) in the Account.  The defendants include the members of the Waddell Group, other unit purchasers, Holiday Isle (which is now in bankruptcy), and RBC Real Estate Finance, Inc. ("REFI"), the current construction lender on the project.

The Waddell Group filed a counterclaim against RBC, a crossclaim against REFI, and third-party claims against Regions Bank ("Regions") and Bay Title Insurance Co. ("Bay Title").  (Doc. 57).  The counterclaim alleges that the purchase documents required that earnest money deposits, including letters of credit, be held by an escrow agent (identified as Bay Title), but that Holiday Isle's construction loan documents provided that earnest money deposits were pledged to and would be held by the construction lender (then Regions or an entity it acquired, later RBC, now REFI), who held plenary authority to call the letters of credit and to hold the resulting proceeds.  (*Id*., ¶¶ 24, 33).

The counterclaim continues that, when it realized it would not complete the project within the two-year period, Holiday Isle devised a plan to ignore the common areas, focus on individual units, and obtain a temporary certificate of occupancy.  RBC is alleged to have been "complicit in the plot."  (Doc. 57, ¶ 36).  As the plan was implemented, RBC

-2-

was or should have been aware of the state of incompletion, and it was or should have been aware that the units were not complete (and that Holiday Isle was thus in default) when the two-year period expired in or about April 2007. (*Id*., ¶¶ 37-43, 46-48).

The counterclaim alleges that, in August and September 2007, Holiday Isle made false warranties to the issuing banks that the members of the Waddell Group were in default and deposited the resulting proceeds from the called letters of credit in the Account, all at RBC's behest and with its active participation. (Doc. 57, ¶ 49). The counterclaim also alleges that, when the Waddell plaintiffs sought injunctive relief to place the Account's funds in escrow, Holiday Isle falsely represented to the judge and the arbitrator that it was solvent and solid, with RBC standing silent despite knowing the representations were false. (*Id*., ¶ 56). The counterclaim further alleges that in April 2008 RBC assigned its rights in the construction loan documents and Holiday Isle's assets to REFI, which is a subsidiary created merely to manage RBC's bad loans, for the purpose of enabling RBC, through REFI, to advance a claim to the interpleaded funds. (*Id*., ¶ 61). The counterclaim also alleges that, between October 2007 and May 2008, Holiday Isle withdrew over $1 million from the Account and paid most of it to the general contractor, all with RBC's knowledge, participation and assent. (*Id*., ¶¶ 62-65).

The counterclaim alleges that RBC's conduct damaged the Waddell Group because they have had to pay principal and interest on the loans the issuing banks forced on them when the letters of credit were called. They also note that Holiday Isle has indicated there may be insufficient funds remaining in the Account (after its $1 million-plus in withdrawals) to reimburse all prospective purchasers. The Waddell Group have also allegedly incurred litigation expenses and experienced emotional distress. They seek relief including return of all misappropriated deposit funds (including payment from outside the Account if its contents are insufficient), and interest and costs associated with the call of the letters of credit and resulting force-placed loans, plus attorney's fees, emotional distress damages, and punitive damages. (Doc. 57, ¶¶ 50, 70; *id*. at 39-49).

The counterclaim includes ten counts: (1) violations of the Alabama Uniform Condominium Act ("AUCA"); (2) conspiracy to violate the AUCA; (3) conversion; (4) wrongful call of the letters of credit; (5) unjust enrichment; (6) breach of fiduciary duty; (7) fraudulent suppression; (8) money had and received; (9) intentional interference with contractual and business relations; and (10) injurious falsehood.  (Doc. 57 at 38-49). RBC moves to dismiss all of these counts under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

## DISCUSSION

In order to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must as a threshold matter provide "a short and plain statement of the claim showing that the pleader is entitled to relief" as required by Rule 8(a)(2).  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Though they need not be detailed, "[f]actual allegations must be enough to raise a right to relief above the speculative level ...."  *Id*.  Thus, neither "labels and conclusions" nor "a formulaic recitation of the elements of a cause of action" suffices to satisfy Rule 8(a)(2).  *Id*.  "Stated differently, the factual allegations in a complaint must 'posses enough heft' plausibly to suggest that the pleader is entitled to relief. ...  Facts that are 'merely consistent with' the plaintiff's legal theory will not suffice when, 'without some further factual enhancement [they] stop short of the line between possibility and plausibility of "entitlement to relief."'"  *Weissman v. National Association of Securities Dealers, Inc*., 500 F.3d 1293, 1310 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 557).

If, but only if, "a claim has been stated adequately [under Rule 8(a)(2)], it may be supported by showing any set of facts consistent with the complaint."  *Twombly*, 550 U.S. at 563 (explaining *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  That is, "[a] motion to dismiss [for failure to state a claim] may be granted only when a defendant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." *Kirwin v. Price Communications Corp.*, 391 F.3d 1323, 1325 (11th Cir. 2004) (internal quotes omitted).  In making this assessment, "all facts set forth in the plaintiff's complaint are to be accepted as true ...."  *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (internal quotes omitted).

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  The Court's review on this motion to dismiss is similarly limited to those arguments the parties have expressly advanced.  Moreover, "a passing reference to an issue in a brief [is] insufficient to properly raise that issue," *Transamerica Leasing, Inc. v. Institute of London Underwriters*, 430 F.3d 1326, 1331 n.4 (11th Cir. 2005), and the Court will not supply legal or analytical support the parties have declined to offer themselves.

RBC articulates five arguments in support of its motion to dismiss: (1) the counterclaim was untimely filed; (2) the counterclaim falls outside the scope of RBC's action; (3) the counterclaim is barred by res judicata and/or collateral estoppel; (4) RBC owed no duty to the Waddell Group; and (5) the members of the Waddell Group who lost before the arbitrator cannot prevail on their counterclaim.  The Court considers these arguments in turn.

## I.  Timeliness.

As noted, RBC was a defendant in the Waddell litigation.  RBC does not suggest that the Waddell Group was required to file their counterclaim in this action while RBC remained a party to the Waddell litigation.  It argues, however, that once it was dismissed from the Waddell litigation, the Waddell Group had a maximum of two weeks to file a counterclaim in this action or forever lose the right to do so.  Because RBC was dismissed

from the Waddell litigation on January 30, 2009,[2] and because the counterclaim was not filed until March 26, 2009, RBC concludes that the counterclaim is time-barred.  (Doc. 80 at 4-5).

For its argument, RBC relies on Rule 12(a)(4), which governs the time for serving a responsive pleading once a party files a motion under Rule 12.  The only motion to dismiss filed herein was filed by Holiday Isle while this case was pending in the Northern District, (Doc. 7), which was never expressly addressed or denied.  (Doc. 36).

With or without resort to Rule 12(a)(4), the counterclaim is not untimely.  The complaint was filed in the Northern District on October 22, 2008, so no responsive pleading could have been due before mid-November.  Fed. R. Civ. P. 12(a)(1)(A)(i) (a defendant has twenty days to answer after being served with process).  Before that time arrived, however, Judge Proctor ordered the parties to focus on the threshold issue of whether the case should be transferred to the Southern District, (Doc. 16), and the parties complied.  On December 15, Judge Proctor ordered transfer, but the actual transfer was not accomplished until late January 2009, and RBC did not seek transfer of the interpleaded funds until February.  (Docs. 37-38, 41).  On March 26, the Magistrate Judge held a scheduling conference, as a result of which he ordered that all parties file an answer by April 2, 2009.  (Doc. 59 at 1-2).  The Waddell Group's responsive pleading was filed before this date and even before the scheduling conference, (Doc. 57), and so is timely.

RBC objects that the Magistrate Judge's order allows only the filing of an "answer," not a counterclaim.  (Doc. 110 at 15).  What RBC overlooks is that an answer is a "pleading," Fed. R. Civ. P. 7(a)(2), and that a "pleading" may contain a counterclaim.  *Id*. 13(a)(1), (b).  By authorizing an answer, the Magistrate Judge authorized a counterclaim as part of the answer.  That RBC may have told the Magistrate Judge it

---

[2]Because no defendant in the Waddell litigation had served an answer or motion for summary judgment, the Waddell plaintiffs' notice of voluntary dismissal without prejudice was effective when filed.  Fed. R. Civ. P. 41(a)(1)(A)(i).  For good measure, the Court confirmed the dismissal on February 9, 2009.

objected to the late filing of counterclaims, (Doc. 110 at 15), does not alter the effect of his scheduling order.

Even were there some question on this point, whether to allow a tardy counterclaim is a matter committed to the Court's discretion under Rule 13(f). *E.g., Braxton v. United States*, 858 F.2d 650, 656 (11th Cir. 1988). RBC so concedes. (Doc. 110 at 15). A counterclaim may be added "if it was omitted through oversight, inadvertence, or excusable neglect or if justice so requires." Fed. R. Civ. P. 13(f). Given the procedural history of this case, the interests of justice so require. The parties (and there are dozens of them) were being served at various times, they were directed by the judge to focus on venue issues, there was a lag between the order for transfer and its accomplishment (and a further lag before RBC had the funds transferred), and this amorphous litigation had no real shape until the Magistrate Judge imposed order in March, by which time the counterclaim had been filed.

Moreover, "[t]he argument for allowing amendment is especially compelling when, as here, the omitted counterclaim is compulsory ...." *Spartan Grain & Mill Co. v. Ayers*, 517 F.2d 214, 220 (5th Cir. 1975). A counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A). A counterclaim arises out of the same transaction or occurrence as the original claim if there is a "logical relationship" between the two. *E.g., Construction Aggregates, Ltd. v. Forest Commodities Corp*., 147 F.3d 1334, 1337 n.6 (11th Cir. 1998). A logical relationship exists "when the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant." *Republic Health Corp. v. Lifemark Hospitals, Inc*., 755 F.2d 1453, 1455 (11th Cir. 1985) (internal quotes omitted). RBC's complaint alleges that the Waddell Group and others presented letters of credit to Holiday Isle, that Holiday Isle called the letters of credit, that Holiday Isle deposited the resulting proceeds in the Account, and that there is a dispute as to whom the funds in the Account

may legally be paid.  These are precisely the facts that give rise to the Waddell Group's counterclaim and activate their legal rights.  Because the counterclaim is thus compulsory, the case for allowing amendment is "especially compelling."

Finally, RBC identifies no prejudice to it by any delay in the assertion of the counterclaim, and there could scarcely be any during the six weeks at issue (from February 13 to March 26).  *See Spartan Grain*, 517 F.2d at 220 (absent prejudice or delay of proceedings, the trial court abused its discretion by denying leave to assert a counterclaim).  All RBC relies on is the lapse of what it considers an objectionable amount of time, but "[t]he mere passage of time ... is not a sufficient reason for denial of the motion."  *Id*.

In summary, the counterclaim is not due to be dismissed as untimely.

## II.  Scope of the Counterclaim.

RBC acknowledges that "interpleader actions are subject to rules governing compulsory counterclaims."  (Doc. 110 at 2).  It also acknowledges that an "'independent' liability claim may withstand a motion to dismiss."  (*Id*. at 4).[3]  However, RBC argues that the Waddell Group's counterclaim impermissibly seeks return of funds in the Account, which is the very sort of counterclaim the interpleader rules are designed to foreclose. (Doc. 110 at 4).

As noted, each count of the Waddell Group's counterclaim seeks the "return of all misappropriated deposit funds."  (Doc. 57 at 39-49).  But that is not the only relief they seek.  Each count also demands an award of: (1) the difference between the amount

---

[3]These concessions are appropriate.  *See, e.g., Prudential Insurance Co. v. Hovis*, 553 F.3d 258, 264 (3rd Cir. 2009) ("[T]he normal rule is that interpleader protection does not extend to counterclaims that are not claims to the interpleaded funds."); *accord United States v. High Technology Products, Inc*., 497 F.3d 637, 643 (6th Cir. 2007); *Dakota Livestock Co. v. Keim*, 552 F.2d 1302, 1307 (8th Cir. 1977); *Liberty National Bank & Trust Co. v. Acme Tool Division*, 540 F.2d 1375, 1379-80 (10th Cir. 1976).

available in the Account and the amount of the Waddell Group's letters of credit (with interest); (2) the principal and interest the Waddell Group have paid their issuing banks on the loans they were forced to take out when the letters of credit were called; (3) the attorney's fees they have incurred as a result of the plaintiff's alleged wrongful conduct; (4) emotional distress damages; and (5) punitive damages.  (*Id*.).   None of these elements of damages represents a call on the funds that are the subject of the interpleader.

   "Because what entitles a stakeholder to bring an interpleader action in the first place is the prospect of multiple liability, in the typical case the protection provided by that device is limited to the interpleaded defendants' competing claims to the fund." *Prudential Insurance Co. v. Hovis*, 553 F.3d 258, 264 (3rd Cir. 2009).  Any counterclaim that is "truly independent of who was entitled to" the fund is permissible.  *Id*.  RBC is correct that a counterclaim based on its decision to file an interpleader rather than to choose which competing claims of the defendants to honor would be barred.  *Id.* at 265 (the stakeholder's "failure to choose between the adverse claimants (rather than bringing an interpleader action) cannot itself be a breach of a legal duty").

   The Waddell Group's counterclaim, however, is not based on the premise that RBC should have paid the funds in the Account to them in preference to Holiday Isle and the other claimants.  Rather, the counterclaim is based on the theory that RBC should have taken and avoided certain action long before the funds even existed, should not have taken possession of the funds to begin with, and should not have allowed the funds to be dissipated.  A thief who stole from a divorcing couple would not gain immunity simply by interpleading a portion of the stolen property, and neither can RBC by interpleading the remaining funds in the Account preclude the Waddell Group from suing for RBC's wrongful conduct in and before acquiring those funds and in allowing a portion of the funds to be withdrawn by Holiday Isle.  RBC cites no law even remotely to the contrary.[4]

---

   [4]Within its briefing on this issue, RBC tosses out a couple of unrelated possibilities.  First, it says it cannot be liable for conversion, unjust enrichment, and

In summary, the counterclaim is not due to be dismissed as barred by RBC's interpleader.[5]

## III.  Res Judicata/Collateral Estoppel.

As noted, the Waddell Group were plaintiffs in the Waddell litigation, most of whom received awards from the arbitrator.  Those awards were based on Holiday Isle's default under the parties' contracts by failing to complete the units within two years of the contracts' effective date.  The Waddell plaintiffs also presented a wealth of other claims to the arbitrator.  RBC argues that the arbitrator "exonerated" Holiday Isle on all claims other than as stated above and that this shields RBC from the counterclaim based on principles of res judicata and collateral estoppel.  (Doc. 80 at 7-13).

RBC asserts that federal law governs the application of res judicata here, (Doc. 110 at 14 n.15), yet it relies exclusively on Alabama authority.  (Doc. 80 at 7-8).  That alone is sufficient reason to reject its position, but there are others.  RBC acknowledges that one element required for application of res judicata is a substantial identity of parties between the prior and current litigation, which RBC takes to mean only that the party against which res judicata is asserted must be substantially identical to the losing party in the preceding litigation.  (Doc. 80 at 8).  For this proposition, it relies on Alabama authorities it acknowledges do not apply.  Under governing federal law, "there must be identity of *both* parties or their privies."  *In re: Atlanta Retail, Inc.*, 456 F.3d 1277, 1285 (11th Cir. 2006)

---

money had and received because it has now (over a year after they were deposited) interpleaded the funds in the Account.  (Doc. 80 at 6).  Second, it suggests the Waddell Group cannot recover certain elements of damages because they would have been incurred regardless of RBC's conduct.  (Doc. 110 at 4).  These positions are insufficiently developed to allow their consideration by the Court.

[5]This ruling makes it unnecessary to consider the Waddell Group's arguments concerning the relationship between RBC and REFI and the impact that could have on the scope of permissible counterclaims.  (Doc. 99 at 13-14).

(emphasis added).  RBC has not addressed, much less distinguished, this line of authority requiring it to be substantially identical to Holiday Isle.

Instead, RBC suggests that it is in fact substantially identical with Holiday Isle because its liability is "dependent" on Holiday Isle's liability.  (*Id*. at 7, 12).  It has not, however, supported its position.  On the contrary, the counterclaim indicates that RBC, inter alia, actively engineered the allegedly wrongful calling of the letters of credit, breached its own duty to correct Holiday Isle's misrepresentations concerning the need for an escrow account, manipulated its interest in the funds to REFI so as to advance its own interests at the other claimants' expense, and participated in Holiday Isle's withdrawal of over $1 million from the Account, which is now unavailable to the Waddell Group.  These are allegations of active, not vicarious, wrongdoing.  RBC takes the counterclaim's allegations that it "participated" in wrongdoing with Holiday Isle as showing that its liability is derivative of Holiday Isle's, (*id*. at 7, 10), but participation in a tort is perfectly consistent with joint tortfeasor status.  *E.g., AT&T Information Systems, Inc. v. Cobb Pontiac-Cadillac, Inc*., 553 So. 2d 529, 534 (Ala. 1989).

Because RBC's liability is not derivative of Holiday Isle's, it cannot prevail on its related argument that the exoneration of Holiday Isle precludes its own liability.  (Doc. 80 at 9).  Nor is it clear that the arbitrator exonerated Holiday Isle.  The Court is very familiar with the award, having recently confirmed most of it over Holiday Isle's objection.  It is plain that the arbitrator addressed only some of the Waddell plaintiffs' claims:  (1) breach of contract (failure to complete) (Counts Ten and Eleven); (2) voidness for lack of mutuality and being illusory (Count One); (3) violations of the Interstate Land Sales Full Disclosure Act ("ILSA") (Counts Seven and Nine); and (4) violations of the AUCA (Counts Eight and Seventeen).  This is made obvious by: (1) the arbitrator's listing of the plaintiffs' claims, which were limited to these claims, (Doc. 80, Exhibit C at 2); (2) the arbitrator's summary of Holiday Isle's position, which addressed only these claims, (*id*.); the arbitrator's second listing of the plaintiffs' claims, which listed only these claims, (*id*.

at 11); and (4) the arbitrator's discussion, which addressed only these claims.  (*Id.* at 3-15).

The flip side of this coin is that the arbitrator did not address the Waddell plaintiffs' claims for injunctive relief (Counts Two - Six); conversion (Count Twelve); wrongful call of letters of credit (Count Thirteen); unjust enrichment (Count Fourteen); injurious falsehood (Count Fifteen); breach of fiduciary duty (Count Sixteen); fraudulent suppression (Count Eighteen); or money had and received (Count Nineteen).  RBC has not attempted to explain how the arbitrator could, by silence, "exonerate" Holiday Isle on these claims.

Instead, RBC suggests the arbitrator actually addressed them.  First, it notes the arbitrator's statement that "I am not persuaded that there is substantial evidence that respondents engaged in fraud, deceit or concealment."  (Doc. 80, Exhibit C at 13).  It is plain, however, that he was addressing only the ILSA claims, since he had just set forth the plaintiffs' position that the defendants' fraud, deceit and concealment violated ILSA.  (*Id.*).[6]  Even could the quoted language be stretched beyond the ILSA claims, RBC does not explain how it could exonerate Holiday Isle on such claims as conversion, unjust enrichment, or money had and received, which appear to require no showing of fraud, deceit or concealment.

Second, RBC points to the arbitrator's statement that "claimants have not provided evidence in this proceeding that would support an award different in scope from return of deposits plus accrued interest for any claim for which there would be an affirmative finding."  (*Id.* at 14-15).  This isolated statement, however, cannot easily be attributed to any claims other than the ones the arbitrator acknowledged as being at issue.

RBC's collateral estoppel argument does cite federal law, but it fails to show

_____

[6]The ILSA counts in the complaint in arbitration likewise included these terms and the allegation that they supported ILSA liability.  ILSA liability may in fact be established by omitting to state material facts necessary to make statements not misleading or by engaging in a practice that does or would "operate as a fraud or deceit upon a purchaser."  15 U.S.C. § 1703(a)(2)(B), (C).

RBC's entitlement to its protection.  As RBC notes, it must establish that the "identical" issue presented in this case was "actually litigated" and "determin[ed]" in the arbitration. *E.g., CSX Transportation, Inc. v. Brotherhood of Maintenance of Way Employees*, 327 F.3d 1309, 1317 (11th Cir. 2003).  As noted above, RBC has not demonstrated that the arbitrator resolved any claim for conversion, wrongful call, unjust enrichment, injurious falsehood, breach of fiduciary duty, fraudulent suppression, or money had and received. The arbitrator did briefly address the AUCA claim, finding that the Waddell plaintiffs failed to show they had been adversely affected by any violation.  (Doc. 80, Exhibit C at 12-13).  However, the complaint in arbitration identified several alleged violations of the AUCA beyond those alleged in the counterclaim, and RBC has not endeavored to show that the parties litigated, and that the arbitrator actually resolved, the precise statutory violations at issue here.

Moreover, in order for collateral estoppel to apply, the determination of the issue in the prior litigation "must have been a critical and necessary part of the judgment in that action."  *CSX*, 327 F.3d at 1317.  A ruling that is only an alternate holding does not satisfy this standard.  *Dennis v. United States Bureau of Prisons*, 2009 WL 840405 at *3 (11th Cir. 2009).  If, as RBC argues, the arbitrator's reference to damages extends to the AUCA claim, it may render any decision as to the merits of the AUCA claim a mere alternative holding, since it would make a ruling for the Waddell plaintiffs on the AUCA claim superfluous.  Whatever arguments could be advanced in opposition to this position, RBC has not articulated them.

In summary, the counterclaim is not due to be dismissed on the grounds of res judicata or collateral estoppel.

## IV.  Duty to the Waddell Group.

RBC first announces that it had no duty of any kind to the Waddell Group because they are asserting liability against it only in its role as construction lender, and Alabama

law precludes any duty to a third party based simply on the lender's status as a lender. (Doc. 80 at 14-15).  But as it concedes in its reply brief, the Waddell Group does not hinge duty on RBC's mere status as a lender.  (Doc. 110 at 5-6).

RBC next argues that, because the Waddell Group in their response focused on the existence of a fiduciary duty arising from RBC's stepping into the shoes of the escrow agent, they thereby admitted that no other source of duty exists.  RBC concludes that this admission dooms the counts for conspiracy, conversion and injurious falsehood because they allege "complicity in a 'plot'" to wrongly call the letters of credit.  (Doc. 110 at 5-6). The Waddell Group, however, did not admit that the only duty at issue is the fiduciary duty of an escrow agent.  On the contrary, they expressly asserted that the counterclaim is "not premised solely upon a duty to escrow funds."  (Doc. 99 at 28).  RBC complains that it does not know what other duty the Waddell Group could have in mind, (Doc. 110 at 6 n.5), but it is RBC's burden on motion to dismiss to negate the existence of a duty, not the burden of the Waddell Group to prove such a duty.[7]

Moreover, the Waddell Group asserts that RBC's fiduciary duty arose before the letters of credit were called, so that it applies to counts addressing RBC's conduct prior to, and including, the allegedly wrongful call.  RBC focuses on the counterclaim's allegations that, by holding the proceeds of the called letters of credit, it became a fiduciary as to the Waddell Group.  (Doc. 57, ¶¶ 53, 87). These, however, are not the only allegations relevant to fiduciary duty.  Elsewhere, the counterclaim alleges that the letters of credit constituted earnest money deposits; that all earnest money deposits must by law be held by an escrow agent; that the construction documents provided for the lender (at the relevant

---

[7]Nor is it clear that no such duty could exist.  The duty not to convert the property of another is pretty near universal, the duty not to manipulate third parties into telling lies to acquire another's property for the benefit of the manipulator is at least not facially implausible, and the duty not to conspire to violate another's rights is no less likely than a duty not to violate those rights directly.  Whatever arguments against the existence of such duties could have been made, they have not been.

time, RBC) to hold the earnest money deposits; and that RBC therefore was subject to a legal duty to escrow all earnest money deposits.  (*Id*., ¶¶ 31, 33, 66, 72).  These allegations are incorporated in all counts of the counterclaim.  (*Id*. at 37-48).  In their brief, the Waddell Group explain that RBC "knew, based on [the construction documents], that it was in full control of the deposits and was therefore a fiduciary to the purchasers," and they continue that this relationship required RBC to disclose its role and partiality, before the letters of credit were called.  (Doc. 99 at 25-26).  RBC acknowledges its understanding of the assertion that a fiduciary duty arose in relation to the letters of credit, before they were called.  (Doc. 110 at 6-7).

RBC next argues that it could not have stepped into the shoes of the escrow agent, and thereby become subject to a fiduciary duty, because its contract documents did not expressly provide for that result and because it did not otherwise "consciously assume" such a responsibility.  (Doc. 110 at 7-9).  Assuming without deciding that the argument is properly raised on motion to dismiss and has been properly supported, RBC cites only Kansas authority for the proposition that these circumstances foreclose the possibility of a fiduciary duty.[8]  Nor does RBC address the Waddell Group's argument that, by taking control of the letters of credit (and later, the proceeds) with knowledge from the purchase agreements that they were required to be held in escrow, RBC became saddled with that status and its accompanying fiduciary duty.  (Doc. 99 at 4, 24-25).  *See also Holiday Isle, LLC v. Adkins*, 2008 WL 2153366 at *7, 9 (Ala. 2008) (Cobb, C.J., dissenting) (once the escrow agent resigned and returned the letters of credit to the developer, "Holiday Isle is now acting as the escrow agent").

---

[8]*Burton v. R.J. Reynolds Tobacco Co*., 397 F.3d 906, 911 (10th Cir. 2005) (discussing Kansas law).  In a related vein, RBC suggests no fiduciary duty can arise unless the party claiming it has a pre-existing relationship with the fiduciary, in whom he or she has placed a peculiar confidence.  (Doc. 110 at 8).  RBC again relies only on an unadorned citation to *Burton*.  Kansas law has no application to this case, and it is not the function of the Court to hunt for comparable Alabama principles on RBC's behalf.

The plaintiff devotes more attention to its argument that, as a matter of law, there is no duty under the AUCA to place in escrow either letters of credit or their proceeds when called.  (Doc. 80 at 18-20; Doc. 110 at 9).  This result is compelled, it argues, by the decisions in *Adkins* and *Murray v. Holiday Isle, LLC*, 620 F. Supp. 2d 1302 (S.D. Ala. 2009).

The AUCA requires that "[a]ny deposit made in connection with the purchase or reservation of a unit ... shall be placed in escrow ...."  Ala. Code § 35-8A-410.  This language "does not operate to preclude the parties from entering into an agreement in which, in lieu of an earnest-money deposit, a standby letter of credit is issued by a neutral bank ...."  *Adkins*, 2008 WL 2153366 at *5.  RBC interprets this language to mean that letters of credit and their proceeds are not "deposits" subject to escrow.  Whether or not that language by itself might support RBC's contention, is not the only relevant passage in the opinion.

"If the *proceeds* of the letters of credit are *disbursed* and the purchasers' default cannot later be established, the purchasers' remedy is an action at law against the beneficiary of the letters of credit or perhaps against the depository party for want of due care in honoring the *demand for payment* ...."  *Adkins*, 2008 WL 2153366 at *6 (emphasis added).  The quoted language supports the proposition that letters of credit constitute deposits subject to the escrow requirement.  *See id.* at 8 (Cobb, C.J., dissenting) ("As the majority acknowledges, a deposit for the purchase of a condominium unit, whether cash or a letter of credit, is to be held by an escrow agent ....").  The italicized portions also support the proposition that the proceeds of letters of credit must be placed in escrow.  The "depository party" is the escrow agent, *id*. at 5 (quoting Ala. Code § 35-8A-410 Alabama commentary), and the quoted language envisions a purchaser's claim against the escrow agent for inappropriately "disbursing" the "proceeds" of a letter of credit pursuant to a "demand for payment," which could not occur unless the proceeds had first been placed in escrow. There may be other interpretations of this passage, but RBC has offered none, so it

-16-

has not shown that *Adkins* as a matter of law precludes a duty to place in escrow either the letters of credit or their proceeds.[9]

Finally, RBC argues that the fraudulent suppression count is due to be dismissed because it had no duty to disclose.  (Doc. 80 at 15-18; Doc. 110 at 11).   This argument proceeds from the false premise that the suppression count is based only on RBC's failure to "disclose its security interest in the letters of credit."  (Doc. 80 at 15; *id*. at 17, 18; Doc. 110 at 11).  Count Seven, however, also alleges that RBC concealed: that the Waddell Group's letters of credit were never placed in escrow; that RBC maintained plenary control over them, including the unilateral right to force their call; that RBC considered the letters of credit its collateral; that RBC seized as its own the disputed proceeds; and that RBC allowed the developers to spend those proceeds on construction costs and other operating expenses.  (Doc. 57, ¶ 89).  It would be pointless to address an argument that ignores most of the bases of the count to which it is directed.  Nor has RBC responded to the Waddell Group's argument that a duty to disclose arises from RBC's status as fiduciary.  (Doc. 99 at 26).

In summary, neither the counterclaim nor any count within it is due to be dismissed for want of a duty running from RBC to the Waddell Group.

## V.  Arbitration Losers.

The arbitrator ruled that the units of Billie Murry, Robert Downs and Gregory Downs were timely completed and that Holiday Isle was therefore entitled to the proceeds

---

[9]This Court in *Murray* did not adopt RBC's position.  The Court stated only that, given the allegations of the complaint, a claim against the developer for violating Section 35-8A-410 by refusing to place the proceeds of letters of credit in escrow was superfluous; if the plaintiffs were in default, the developer was entitled to the proceeds and so could not be required to place them in escrow, and if the plaintiffs were not in default, they had equivalent recourse under their conversion claim.  620 F. Supp. 2d at 1338.

of their letters of credit.  (Doc. 80, Exhibit C at 11, 15).  The Court has confirmed that award.  RBC posits that this requires dismissal of the counterclaim as to them.  (Doc. 80 at 21).

The Waddell Group failed to respond to this argument, but the Court cannot grant the motion on that ground alone.  *Cf. United States v. One Piece of Real Property*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion.").

RBC does not explain the basis of its motion, but it presumably is that the arbitrator's award establishes that these counterclaimants, rather than Holiday Isle, breached the contract and that Holiday Isle, rather than the counterclaimants, therefore had the right to the letters of credit and their proceeds.  The question RBC fails to address is which of the ten counts of the counterclaim depend on the counterclaimants' lack of breach and consequent entitlement to the letters of credit and their proceeds.  The Court's review of the counterclaim reveals that the counts for conversion, wrongful call, unjust enrichment, breach of fiduciary duty, and injurious falsehood all require the counterclaimants to show they were not in breach, and the arbitrator's confirmed award precludes them from doing so.  These counts are therefore due to be dismissed under principles of collateral estoppel discussed in Part III.  The remaining counts appear to allege, at least in part, wrongdoing by RBC preceding the counterclaimants' default, so it is less clear that the arbitration award eliminates those counts.  The Court declines to read the tea leaves without the parties' assistance.

## CONCLUSION

For the reasons set forth above, RBC's motion to dismiss is **granted** with respect to Counts Three, Four, Five, Six and Ten as to Billy Murry, Robert Downs and Gregory

-18-

Downs.  In all other respects, the motion to dismiss is **denied**.

DONE and ORDERED this 14th day of September, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE